## Chicago, Milwaukee & St. Paul Railway Company et al. v. Kellie B. Carpenter.

### Gen. No. 4,581.

1. RAILROAD COMPANY—*when liable to landowner for damage resulting from construction of road.* It is the duty of a railroad company in constructing its road across watercourses so to construct it as not to impair their usefulness in carrying off water flowing through them, and although it may be constructed according to approved principles of engineering, yet if injury necessarily results to adjoining landowners, the company will be liable.

Action of trespass for injury to real property. Appeal from the Circuit Court of Carroll County; the Hon. OSCAR E. HEARD, Judge,

presiding. Heard in this court at the October term, 1905. Affirmed. Opinion filed March 10, 1906.

George L. Hoffman, for appellants.

Ralph E. Eaton and C. W. Middlekauff, for appellee.

Mr. Justice Farmer delivered the opinion of the court.

The Ashdale and Thompson Railroad which appears to have been built for operation by the C., M. & St. P. Ry. Co. at the place involved in this controversy, runs in a northerly and southerly direction, parallel with, and about 50 rods west of the west line of a farm of 45½ acres owned by appellee. Just next appellee's west line is a public highway running north and south, parallel with the line of appellee's farm. Between the highway and the railroad the land is owned by Mr. Melendy. Appellee's farm is rather low, flat land, except there is a knoll or elevation in the southwest part of it, upon which the residence and other farm buildings stand. Sand Creek rises about two miles east of appellee's farm and flows northwesterly across his land and empties into Johnson Creek west of the railroad and drains about seven hundred acres. At its source where the water comes down from the higher land, there are deep gulches or ditches cut in the sand of which the hills are composed, the largest one of these gulches being 100 feet wide at the top and 45 feet deep. The channel proper of the creek grew shallower toward the east. It runs through a basin or valley lower than the surface of the land on either side of it, varying in width from about 150 feet at the east line of appellee's land, to 266 feet wide at the railroad bridge. Between these points the width is not uniform but is irregular, in some places being 500 feet wide. During the years of 1902 and 1903 the Ashdale and Thompson Railroad was built. In building the railroad across Sand Creek, a bridge was constructed across the channel leaving an opening 41 feet wide at the bottom and 58 feet at the top underneath the stringers. From the bottom of the stringers to the surface below was about six feet. From either end of this bridge extending

across the basin of the creek, solid embankments, upon which the track was laid, were built about 8 feet high. In August, 1904, heavy rains in that vicinity caused large quantities of water carrying great quantities of sand to come down through Sand Creek and its basin and overflow portions of appellee's lands and deposit thereon sand to a considerable depth. Again in September following, after another heavy rain the water overflowed his land and again deposited thereon great quantities of sand. The proof shows there were 17 or 18 acres of appellee's farm thus covered with sand to an average depth of about two feet. This suit was brought to recover damages from appellants, the declaration charging them with obstructing the flow of the water by building embankments across portions of the valley or basin of Sand Creek and not leaving a sufficient passageway to carry the water off as it naturally flowed there, thereby causing it to spread over appellee's land and deposit sand thereon.

Appellant's brief and argument is devoted mainly to two propositions: first, that their embankment and structure did not obstruct the flow of the water and therefore did not cause or contribute to appellee's injury; and second, that the rains that caused the damage were very heavy and unusual and the flow and deposit of sand extraordinary and unprecedented. It cannot be denied that appellee's evidence abundantly showed that prior to the building of the railroad, although after every heavy rain Sand Creek carried large quantities of water heavily charged with sand through his land to Johnson Creek, no sand to any appreciable extent was deposited by it, and none on the surface of his land. The fall of Sand Creek from the east line of appellee's farm to the railroad, a distance of about 127 rods, is, according to appellant's statement of the evidence, about 17 feet. In times of heavy rains the water would overflow the banks of the Creek and fill the basin or valley on either side to the higher land, but with such a fall it is apparent the flow was very rapid and this is supported by the testimony of the witnesses who were familiar with the stream. Appellee's evidence also abundantly tended to show that after the rail-

road was built sand began to deposit against the embankment and with succeeding freshets to extend further east toward appellee's premises, and in a large measure filled up the channel of the creek near the railroad bridge before the rains of August and September, 1904.

Upon this question there was a conflict in the evidence but the jury was warranted in finding the weight of it to be with appellee.   The water from the freshet of August, 1904, flowed down against the railroad embankment depositing large quantities of sand in the channel of the creek and the valley on each side and then spread over appellee's land. A short distance northeast of his house a ravine called Spring Branch emptied into Sand Creek and from about the junction of these two streams the water left the Sand Creek Valley and flowed south and then west on the south side of appellee's house to the railroad.   In doing this it passed through his barn and other out buildings depositing large quantities of sand on the surface of all the land it flowed over.   According to the testimony this had never occurred before the railroad was built.   The testimony of witnesses who saw the water come down against the railroad embankment is that when it did so, a kind of billow rolled back east and then left the basin east of appellee's residence, overspread his land, and ran south and west toward the railroad.   The water from the storm of September overflowed the same land and ran off in the same direction.

There was a bridge across the channel of Sand Creek in the public highway running north and south along the west side of appellee's land.   This bridge was something like two and a half feet lower than the top of the rail at the railroad bridge.   The August freshet deposited sand under this bridge so as practically to fill the channel up to the stringers.   After the August flood the highway bridge was raised about two feet, but the September flood again filled the space underneath it with sand.   These floods filled the opening underneath the railroad bridge with sand to within about two and one half feet of the stringers and it is argued from these circumstances that it is impossible the obstruction was caused

by the railroad embankment, but must have resulted from the highway bridge if the overflow and damage were caused by an obstruction. The evidence shows that the highway bridge was 38 feet long and spanned the channel of the creek at a place where it ran next to the south side of the basin and was reached by a short approach from the north. The flow of water from the approach to the north side of basin was unobstructed. The evidence also is that prior to the building of the railroad there was no deposit of sand or filling up of the channel at this bridge. That the railroad embankment did obstruct to some extent the flow of water we think is clear. Prior to the building of the railroad, when the water overflowed the banks of the creek as the proofs show it did at every heavy rain, it had a basin 266 feet wide at the place of the location of the railroad to flow through. This was reduced by the railroad embankment to an opening 41 feet wide at the bottom, and 58 feet at the top. When this rapidly flowing body of water, the entire width of the basin, came down and struck the embankment, all the water on each side of the bridge must necessarily be to some extent retarded until it could flow to and pass through under the bridge. Appellants also constructed ditches north and south from the bridge on the east side of the railroad to bring water from these directions to pass under the bridge, and we think it not an unwarranted conclusion from all the evidence that the railroad embankment obstructed the flow of the water and caused the deposit of sand complained of.

The weight of the proof is that the rains that caused the floods were not unusually heavy nor greater in quantity than had fallen on former occasions. Nor do we think the fact that sand was deposited east, entirely across appellee's farm, and in large quantities west of the railroad bridge, is conclusive that the amount brought down by the waters on the occasions of these two floods was extraordinary and unprecedented. The evidence shows the water was always heavily charged with sand in time of floods, and it is not unreasonable to conclude that prior to the building of the

railroad its rapid current and unobstructed flow enabled it to carry the sand off. We are of the opinion also the deposit of sand west of the railroad in the manner shown by the evidence is not unreasonably attributable to the slackening of the current by the obstruction.

A number of civil engineers testified on behalf of appellants that according to the principles and formulas of good engineering in such cases, the opening under the bridge had twice the capacity required to carry all the water discharged through it from Sand Creek, but this could not control against the testimony of witnesses who testified to their personal knowledge and observation of the fact that it was not sufficient. At least the correctness of the theories of appellants' witnesses and the matters testified to as facts by appellee's, was a proper matter to be determined by the jury and its finding being against appellants upon this proposition, we would not be warranted in disturbing it. Especially is this true in view of the fact that by agreement of the parties the jury in charge of an officer of the court went upon and viewed the premises, and at appellants' request was instructed that such view was a part of the evidence in the case. It is the duty of a railroad company in constructing its road across watercourses so to construct it as not to impair their usefulness in carrying off water flowing through them, and although it may be constructed according to approved principles of engineering, yet if injury necessarily results to adjoining landowners, the company will be liable. C. & M. Ry. Co. v. Thillman, 143 Ill., 127; T., W. & W. Ry. Co. v. Morrison, 71 Ill., 616; C., R. I. & P. R. R. Co. v. Moffit, 75 Ill., 524; O. & M. Ry. Co. v. Wachter, 123 Ill., 440.

We have examined the complaint made as to certain questions asked on behalf of appellee and allowed by the court to be answered concerning the damage to appellee's land. It is conceded by appellants that the measure of damages, if any could be recovered, was the difference between the value of the land before the railroad was constructed and its value after the construction of the rail-

road. This was the rule adopted by the court and there was
nothing in the questions complained of that could possibly
have led the jury to misunderstand the rule, or think they
would be authorized to award appellee any damages other
than such as was caused by the obstructions complained of.
Moreover, it is not claimed the damages are excessive accord-
ing to the proper rule for assessing them, if appellee was
entitled to recover.     •

Some objection is made to the ruling of the court in giv-
ing instructions on behalf of appellee. The most serious
complaint under this assignment is that certain of appellee's
instructions did not take into account one of appellants'
theories of defense. We see no serious objection to the
instructions complained of, but conceding that some of them
did omit a theory of the defense, the court instructed the
jury to consider the instructions as one connected body and
series, applicable to the facts as a whole and not detached
or separated, and at appellants' request covered and re-
peated in numerous instructions and very forcible language
every conceivable defense they were entitled to have the
jury instructed upon.

Believing substantial justice has been done in this case
and that there are no errors in the record that would justify
a reversal, the judgment is affirmed.

*Affirmed.*